[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-14881
_____

D.C. Docket No. 0:14-cv-62610-BB


SUN LIFE ASSURANCE COMPANY OF CANADA,

> Plaintiff - Counter
> Defendant - Appellee
> Cross Appellant,

versus

U.S. BANK NATIONAL ASSOCIATION,

> Defendant - Counter
> Claimant - Appellant
> Cross Appellee.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 12, 2017)

Before HULL, MARCUS, and ROGERS,[*] Circuit Judges.

PER CURIAM:

Sun Life Assurance Company of Canada ("Sun Life") brought this action against U.S. Bank National Association ("U.S. Bank"), which owned a $5 million life insurance policy, issued by Sun Life, on the life of Phyllis Malkin (the "Policy").

Larry Bryan operated Simba, a Florida insurance brokerage which targeted elderly clients for life insurance transactions. In 2006, Simba procured the Policy on behalf of Malkin, who at the time was in her mid-seventies. Another entity, Coventry Capital LLC ("Coventry"), acted as the Policy's funder. The Policy's designated beneficiary was a trust for which Malkin's husband was the beneficial owner (the "Malkin Trust"). The Policy took effect in 2006.

Simba structured its life insurance transactions so that the application listed a trust as the owner of the policy, but the trust in turn would be controlled by the funder of the policy. At Simba's direction, the client, like Malkin, would complete paperwork allowing Simba to obtain the client's medical records. Simba would send that paperwork to the funder, like Coventry, which would assess the client's life expectancy, and to insurance companies to determine for which policies the client might be eligible. Once Simba received the offers back from the insurers,

---

[*]Honorable John M. Rogers, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Simba would package those offers together and send them to the funder. Based on the policies offered and its assessment of the client's life expectancy, the funder would decide whether to offer to fund a particular insurance policy. The funder would also decide how to fund the deal.

There is no evidence indicating that Malkin ever paid premiums on the Policy. Coventry's business records confirm that someone made the initial premium payments on the Policy, but the parties dispute whether it was Coventry that made these initial payments. In August 2008, the Malkin Trust sold the Policy to Coventry for $255,000. Shortly after that sale, U.S. Bank purchased the Policy from Coventry. From 2008 to 2014, U.S. Bank made premium payments on the Policy until Malkin's death in September 2014.

In 2014, when U.S. Bank made a claim for benefits under the Policy, Sun Life refused to pay the benefits and filed a civil action against U.S. Bank seeking declaratory and other relief. Sun Life alleged that the Policy constitutes a "stranger originated life insurance" ("STOLI") policy, which this Court has described as follows:

> A STOLI policy is a speculative investment device that entails gambling on the lives of the elderly. In its purest form, a STOLI transaction works like this: A speculator secures an agreement with a person, who is usually elderly, authorizing the speculator to buy insurance on that person's life. The speculator usually gets the policy in the largest amount available and pays the premiums, hoping to profit in one of two ways. One way is if the insured dies before the premiums paid exceed the death benefit. Under that scenario the

3

sooner the insured dies, the fewer the premium payments that are necessary to obtain the payout, and the greater the return on investment.  The other way the speculator can profit is by selling the policy to another speculator for more than the premiums paid up to the point of that sale.

Sciarretta v. Lincoln Nat. Life Ins. Co., 778 F.3d 1205, 1207-08 (11th Cir. 2015).[1]

Sun Life sought an order declaring that, because the Policy was procured as a wagering contract and lacked an insurable interest from its inception, the Policy was void ab initio.  U.S. Bank filed counterclaims seeking, inter alia, a return of all premium payments made pursuant to the Policy.

At the close of discovery, Sun Life and U.S. Bank filed motions for summary judgment.  The district court determined that:  (1) Delaware law governed the resolution of the parties' claims; (2) under Delaware law, the Policy lacked an insurable interest at its inception and thus was void ab initio; and (3) Sun Life must return to U.S. Bank the premiums paid pursuant to the Policy.  The district court entered final judgment in favor of Sun Life as to Sun Life's declaratory judgment claims and in favor of U.S. Bank as to U.S. Bank's counterclaim seeking the return of premium payments.

In a post-judgment order, the district court clarified that:  (1) U.S. Bank was only entitled to the return of premiums paid after U.S. Bank acquired the Policy from Coventry in 2008; (2) U.S. Bank was not entitled to an award of prejudgment

---

[1]The STOLI policy at issue in Sciarretta was brokered by the same Larry Bryan who was involved in the procurement of the Malkin Policy.  Sciarretta, 778 F.3d at 1209-10.

interest on those premium payments; and (3) Sun Life was not entitled to a set-off

for costs associated with originating and maintaining the Policy.  Both U.S. Bank

and Sun Life appealed.

After review of the record and the parties' briefs, and with the benefit of oral

argument, we affirm in part, reverse in part, and remand for further proceedings.

As to all issues except the award of prejudgment interest, we discern no reversible

error in the district court's thorough and well-reasoned orders and thus affirm.

With respect to the issue of prejudgment interest, however, we reverse the

judgment of the district court.  Under Delaware law, "prejudgment interest is

awarded as a matter of right" and "is to be computed from the date payment is

due."  Citadel Holding Corp. v. Roven, 603 A.2d 818, 826 (Del. 1992).

Ultimately, the purpose of awarding prejudgment interest is to ensure that the

claimant is fully compensated for the loss of the time value of its money.  Brandin

v. Gottlieb, No. CIV. A. 14819, 2000 WL 1005954, at *30 (Del. Ch. July 13, 2000)

(unpublished).  Determining the date that payment is due is "ordinarily a question

of law."  Roven, 603 A.2d at 826.

The "general rule" in Delaware "is that interest starts on the date when

payment should have been made."  Metro. Mut. Fire Ins. Co. v. Carmen Holding

Co., 220 A.2d 778, 782 (Del. 1966).  In cases where the claimant demands

payment from the defendant, but the defendant wrongfully refuses, prejudgment

interest accrues from the date of the defendant's refusal.  <u>See</u> <u>id.</u>  But where, as here, the claimant seeks a refund of payments it never should have made, prejudgment interest accrues from the date of the claimant's payments.  <u>See, e.g.</u>, <u>Valeant Pharm. Int'l v. Jerney</u>, 921 A.2d 732, 756 (Del. Ch. 2007) (awarding prejudgment interest from the date that a bonus was wrongfully paid to the defendant executive); <u>Segovia v. Equities First Holdings, LLC</u>, C.A. No. 06C-09-149-JRS, 2008 WL 2251218, at *23 (Del. Super. Ct. May 30, 2008) (unpublished) (awarding prejudgment interest from the date that the claimant paid the origination fees being refunded).

Here, U.S. Bank seeks the refund of premium payments that it never should have made because the Policy was void from its inception.  Under these circumstances, prejudgment interest accrues from the date of payment rather than the date on which U.S. Bank demanded the refund.  Thus, we reverse the district court's determination that U.S. Bank was not entitled to prejudgment interest and remand for calculation of the amount of prejudgment interest due to U.S. Bank and for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**