# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| WELLS FARGO BANK, N.A., as Securities Intermediary, | § § § No. 172, 2021 § |
| and | § Certification of Questions of Law § from the United States Court of |
| BERKSHIRE HATHAWAY LIFE INSURANCE COMPANY OF NEBRASKA, | § Appeals for the Eleventh Circuit § § C.A. No. 19-14689 § D.C. No. 1:17-cv-23136-MGC |
| Defendants/Appellants/Cross-Appellees, | § § § |
| v. | § § |
| ESTATE OF PHYLLIS M. MALKIN, | § § § |
| Plaintiff/Appellee/Cross-Appellant. | § § § |

Submitted: March 9, 2022
Decided: May 26, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon Certification of Questions of Law from the United States Court of Appeals for the Eleventh Circuit. **CERTIFIED QUESTIONS ANSWERED**

A. Thompson Bayliss, Esquire, Stephen C. Childs, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Ginger D. Anders, Esquire (*argued*), Donald B. Verilli, Jr., Esquire, Brendan B. Gants, Esquire, MUNGER, TOLLES & OLSON LLP, Washington, DC, *for Defendant/Appellant/Cross-Appellee Berkshire Hathaway Life Insurance Company of Nebraska*.

Stephen L. Caponi, Esquire, Matthew B. Goeller, Esquire, K&L GATES LLP, Wilmington, Delaware; Samuel O. Patmore, Esquire (*argued*), Jenea M. Reed, Esquire, STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A., *for Defendant/Appellant/Cross-Appellee Wells Fargo Bank, N.A.*

Donald L. Gouge, Jr., Esquire, DONALD L. GOUGE, JR., LLC, Wilmington, Delaware; Gregory J. Star, Esquire (*argued*), Michael L. Miller, Esquire, Joseph M. Kelleher, Esquire, COZEN O'CONNOR P.C., Philadelphia, Pennsylvania, *for Plaintiff/Appellee/Cross-Appellant Estate of Phyllis M. Malkin*.

David J. Baldwin, Esquire, Peter C. McGivney, Esquire, BERGER HARRIS LLP, Wilmington, Delaware; John E. Failla, Mark D. Harris, Nathan R. Lander, Elisa A. Yablonski, PROSKAUER ROSE LLP, New York, New York; Steven O. Weise, Esquire, PROSKAUER ROSE LLP, Los Angeles, California, *for the Delaware Bankers Association as amicus curiae in support of Appellants.*

Stephen B. Brauerman, Esquire, BAYARD P.A., Wilmington, Delaware; Andrew C. Smith, Esquire, Adam Marcu, Esquire, PILLSBURY WINTHROP SHAW PITTMAN LLP, New York, New York, *for the Institutional Longevity Markets Association as amicus curiae in support of Appellants.*

Brian E. Farnan, Esquire, FARNAN LLP, Wilmington, Delaware; Steven Sklaver, Esquire, SUSMAN GODFREY LLP, Los Angeles, California; Ari Ruben, Esquire, SUSMAN GODFREY LLP, New York, New York, *for Hua Nan Commercial Bank, Ltd., Hua Nan Investment Trust Co., Bank Sinopac, Taichung Commercial Bank, Ltd., Entie Commercial Bank, Ltd., KGI Bank Co., Ltd, and Mediatek USA Inc. as amici curiae in support of Appellants.*

**TRAYNOR**, Justice:

In a stranger-originated life insurance ("STOLI") scheme, a speculator contrives to purchase a policy on the life of a stranger. If the stranger dies before the value of the premiums paid by the speculator exceeds the death benefit of the policy, the speculator's bet pays off. STOLI policies violate Article II, § 17 of the Delaware Constitution, which prohibits most forms of gambling. They also offend the longstanding public policy of this State. Hence, 18 *Del. C.* § 2704(b) allows the estate of a deceased STOLI insured to "maintain an action to recover" the death benefit from its recipient. Additionally, this Court has confirmed that STOLI policies are void *ab initio*, never come into legal existence, represent a "fraud on the court," and can never be enforced.[1]

This case is a proceeding under Article IV, § 11(8) of the Delaware Constitution and Supreme Court Rule 41. It concerns two questions certified to this Court by the United States Court of Appeals for the Eleventh Circuit. Question One requires us to decide whether, when faced with an action brought by an estate under Section 2704(b), an innocent downstream investor in a STOLI policy, or its securities intermediary, may assert certain defenses under the Delaware Uniform Commercial Code. The Eleventh Circuit framed the inquiry as follows:

---

[1] *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1069 n.25, 1073 (Del. 2011).

3

*Question One*:  If an insurance contract is void under Del. Code Ann. tit. 18, § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1073 (Del. 2011), is the party being sued under § 2704(b), as a third-party purchaser of the contract and holder of the proceeds, entitled to assert either a bona fide purchaser defense under Del. Code Ann. tit. 6, § 8-502, or a securities intermediary defense under Del. Code Ann. tit. 6, § 8-115?

We conclude that, in the *sui generis* context of STOLI schemes, these defenses are not available.  We therefore answer Question One in the negative:

*Answer to Question One*:  No, because defendants to an action brought under 18 *Del. C.* § 2704(b) do not face an "adverse claim" as the Delaware UCC defines that term.

The second certified question asks us to decide whether downstream investors in a STOLI policy may sue to recover any premiums they paid.  Question Two reads:

*Question Two*:  If an insurance contract is void under Del. Code Ann. tit. 18, § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1073 (Del. 2011), can the party that is being sued under § 2704(b) recover premiums it paid on the void contract?

We answer this question in the affirmative:

*Answer to Question Two*:  Yes, if the party being sued can prove its entitlement to those premiums under a viable legal theory.

In answering the certified questions, we stress that, although the Delaware UCC defenses implicated in this case do not apply in the *sui generis* context of a Section 2704(b) action to recover the proceeds of a STOLI policy, our reasoning does not affect their validity in other contexts.

4

# I.  FACTUAL AND PROCEDURAL BACKGROUND

In 2005, Phyllis Malkin was retired and living in Florida with her husband when she met Larry Bryan.[2]  Bryan was an insurance broker who, through a company called Simba, specialized in arranging non-recourse premium financing to fund the purchase of life insurance policies by seniors.  Simba's business model has, unfortunately, become well known in both Florida and Delaware.[3]  We described it last year in *Lavastone Capital LLC v. Estate of Berland*:

> As Simba pitched it, the transaction allowed clients to "create dollars today by using a paper asset, (a life insurance policy not yet issued from a major insurance carrier insuring your life)" by selling it on the secondary market.  Clients did not need to put up any money upfront. Instead, they got nonrecourse loans to finance the transactions, which allowed them to make all necessary payments without tapping into personal funds.  The only collateral for the loan was the life-insurance policy itself. Simba played the role of a broker in these transactions, reaching out to both the insurers and banks on behalf of its client.[4]

---

[2] The facts are drawn from the "background" section of the Eleventh Circuit's opinion.  *Estate of Malkin v. Wells Fargo Bank, N.A.*, 998 F.3d 1186 (11th Cir. 2021); *see also Estate of Malkin v. Wells Fargo Bank, N.A.*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019); *and see Culverhouse v. Paulson & Co.*, 133 A.3d 195, 196 (Del. 2016) (stating that when considering certified questions of law, the Court "focus[es] on a relevant question of Delaware law against a backdrop of established facts which are not the subject of dispute among the parties").

[3] *See Sun Life Assurance Co. of Can. v. U.S. Bank Nat'l Ass'n*, 693 F. App'x 838, 839–40 & n.1 (11th Cir. 2017) (*per curiam*) (unpublished); *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1209–10 (11th Cir. 2015).

[4] *Lavastone Capital LLC v. Estate of Berland*, 266 A.3d 964, 966 (Del. 2021) (reciting facts as certified by the United States District Court for the District of Delaware).

The Eleventh Circuit found that, before meeting Bryan, Malkin neither wanted nor needed life insurance. Instead, she was interested in Simba's "risk free opportunity to make money."

Working with Simba, Malkin eventually procured $13 million worth of life insurance. The $4 million policy at issue in this case was written by American General Life Insurance Company (respectively, the "Policy" and "AIG"). Another policy, written by Sun Life Assurance Company, was for $5 million (the "Sun Life Policy"). The Eleventh Circuit eventually found that, under Delaware law, the Sun Life Policy was an illegal wager on Malkin's life and was therefore void *ab initio* according to our decision in *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*.[5] Thus, under *Price Dawe* and 18 *Del. C.* § 2704(a), Sun Life was not required to pay the death benefit.

Malkin procured the AIG Policy concurrently with the Sun Life Policy, working through Simba's typical process. As the Eleventh Circuit explained:

> This involved Simba introducing its clients to Coventry Capital I LLC ("Coventry"), and Simba and Coventry worked together to get approval from an insurer, in this case American General Life Insurance Company ("AIG"). . . . Coventry acted as the program administrator and servicing agent of a life insurance premium financing program in connection with LaSalle Bank. In that capacity, Coventry first approved a non-recourse premium finance loan[.] Coventry required Ms. Malkin to fill out

---

[5] *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 2016 WL 161598, at *21 (S.D. Fla. Jan. 14, 2016), *aff'd in part, rev'd in part and remanded*, 693 F. App'x 838 (11th Cir. 2017) (affirming the declaration that the Sun Life Policy was void *ab initio* but reversing the District Court's calculation of prejudgment interest); *see Price Dawe*, 28 A.3d at 1059.

various forms that were "not negotiable," including a document in which she appointed Coventry as her attorney-in-fact, with full authority to originate, service, or liquidate "any life insurance policies on [her] life[.]" Ms. Malkin also signed a loan application form with LaSalle Bank, for which Coventry acted as the program administrator[.] And the Malkins agreed that a trust would be established to hold insurance policies on Ms. Malkin's life.[6]

Bryan eventually confirmed that Simba had given Malkin a "take it or leave it deal[]" and that she did not personally decide to seek coverage from Sun Life or AIG.[7] Neither did Malkin personally foot the bill for any premiums: those were covered by the non-recourse loans set up by Simba through Coventry and Lavastone.

As discussed, the loan that funded the premiums on the AIG Policy was secured only by the Policy itself. When that debt came due on June 16, 2008, Coventry informed Malkin's trust, which was administered by the Wilmington Trust Company, that it would foreclose on the AIG Policy unless Malkin paid off the $360,265.34 loan. True to the scheme's design, the trust agreed to relinquish the AIG Policy to Coventry instead of paying the debt.

During the next four years, the AIG Policy on Malkin's life changed hands several times. Appellant Wells Fargo Bank, N.A. ("Wells Fargo") acquired the Policy in 2012 as securities intermediary for Coventry and another entity.[8] In 2013,

---

[6] *Estate of Malkin*, 998 F.3d at 1191 (footnote omitted).

[7] *Id.*

[8] Under Delaware law, the term "securities intermediary" refers either to a "clearing corporation" or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." 6 *Del. C.* § 8-102(a)(14).

7

appellant Berkshire Hathaway Life Insurance Company of Nebraska ("Berkshire" and, together with Wells Fargo, "Appellants") purchased the Policy, again with Wells Fargo as securities intermediary. The purchase was part of a sale of 125 policies from Coventry to Berkshire, and "Coventry represented to Berkshire that to its knowledge none of the policies was originated in connection with a STOLI transaction."[9] Berkshire acquired the Policy for $322,103 and then kept up with its premiums, paying $137,194.20 to AIG.

Malkin died in September 2014. On October 27, AIG paid the Policy's death benefit—$4 million and change—to Wells Fargo. Two days later, Wells Fargo transferred the money to Berkshire.

Malkin's estate (the "Estate") sued Wells Fargo and Berkshire to recover the death benefit in 2017. The Estate invoked Delaware's insurable-interest statute, the aforementioned 18 *Del. C.* § 2704(b). The parties eventually submitted motions for summary judgment, and the United States District Court for the Southern District of Florida held for the Estate. The court determined that (1) Delaware law governed the Estate's claim, (2) the AIG Policy lacked an insurable interest and was a void *ab initio* human-life wager under Section 2704(b), (3) Malkin never relinquished the Estate's rights to the Policy's proceeds, (4) Berkshire and Wells Fargo's Delaware

---

[9] *Estate of Malkin*, 998 F.3d at 1192 (internal quotation marks omitted).

8

UCC defenses failed as a matter of law, and (5) the Estate was entitled to the Policy's death benefit under Section 2704(b).

Berkshire and Wells Fargo appealed to the Eleventh Circuit. The Estate cross-appealed. The Eleventh Circuit affirmed the District Court's determination that the AIG Policy was void *ab initio* under Section 2704(a). It deferred decision on other issues in the appeal pending this Court's answers to the two certified questions.[10]

## II.  STANDARD OF REVIEW

The certified questions present issues of law, which this Court decides *de novo*.[11]

## III.  ANALYSIS

"For hundreds of years, the law has prohibited wagering on human life through the use of life insurance that was not linked to a demonstrated economic risk."[12] In 1881, the United States Supreme Court recognized that, absent such risk, "the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured."[13] As this Court explained in *Price Dawe*, such wagers violate the Delaware Constitution's prohibition on gambling as

---

[10] *Id.* at 1202–03.
[11] *Price Dawe*, 28 A.3d at 1064.
[12] *Estate of Berland*, 266 A.3d at 967; *see Price Dawe*, 28 A.3d at 1069 (discussing historical background of the insurable interest requirement).
[13] *Warnock v. Davis*, 104 U.S. 775, 779 (1881); *accord Grigsby v. Russell*, 222 U.S. 149, 154 (1911) ("A contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end.").

9

well as "Delaware's clear public policy against wagering." [14]  Consequently, the

Court held that STOLI policies are void *ab initio* and "a fraud on the court," meaning

that they never legally come into existence and cannot be enforced by any court. [15]

Consistently with the Delaware Constitution and the State's public policy, the

General Assembly has codified in 18 *Del. C.* § 2704 the requirement that a person

procuring a life insurance policy have an "insurable interest" in the life of the

insured.  Section 2704(a) provides:

> Any individual of competent legal capacity may procure or effect an
> insurance contract upon his or her own life or body for the benefit of
> any person, but no person shall procure or cause to be procured any
> insurance contract upon the life or body of another individual unless the
> benefits under such contract are payable to the individual insured or his
> or her personal representatives or to a person having, at the time when
> such contract was made, an insurable interest in the individual
> insured. [16]

The remedy for violations of the insurable interest requirement is set forth in

Section 2704(b), which provides that:

> If the beneficiary, assignee or other payee under any contract made in
> violation of this section receives from the insurer any benefits
> thereunder accruing upon the death, disablement or injury of the
> individual insured, the individual insured or his or her executor or
> administrator, as the case may be, may maintain an action to recover
> such benefits from the person so receiving them. [17]

---

[14] *Price Dawe*, 28 A.3d at 1070–1071 (citing Del. Const. art. II, § 17).

[15] *Price Dawe*, 28 A.3d at 1067 & 1068 n.25.

[16] 18 *Del. C.* § 2704(a).  Section 2704(c) defines the categories of persons that have an insurable interest in an individual's life; the categories include the individual insured and others, such as close family members or business associates.

[17] *Id.* § 2704(b).

10

Thus, if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may bring an action to recover the death benefit from the recipient.[18]  Of course, the insurance company is not obligated to pay the death benefit of a STOLI policy and may refuse to do so.  As discussed, this is how the Sun Life Policy on Malkin's life was disposed of: Sun Life secured a declaratory judgment that the policy was an illegal STOLI wager and consequently was not required to pay the death benefit.[19]

The certified questions in this case pertain to the state of play once an insurer has paid the death benefit, as AIG did to Wells Fargo, who transferred it to Berkshire. Specifically, we are asked to decide whether defendants in a Section 2704(b) action in which an estate seeks to recover a death benefit may assert certain defenses and counterclaims.[20]

Answering Question One, we hold that, although Section 2704 does not supersede all defenses and counterclaims, the defenses asserted by Berkshire and

---

[18] *Id.  See also Estate of Berland*, 266 A.3d at 974 (describing Section 2704(b) as establishing a "statutorily-created remedy" for the procurement of a life-insurance policy in violation of the insurable-interest requirement).

[19] *See Sun Life Assurance Co.*, 2016 WL 161598, at *21, *aff'd in part, rev'd in part and remanded*, 693 F. App'x 838 (affirming the declaration that the Sun Life Policy was void *ab initio* but reversing the District Court's calculation of prejudgment interest).

[20] This Court has previously answered certified questions regarding the insurable-interest requirement. *See Price Dawe*, 28 A.3d at 1065 (holding, among other things, that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force"); *Estate of Berland*, 266 A.3d at 966 (holding, among other things, that "a death-benefit payment that is made on a policy that is void *ab initio* under [Section 2704(a) and *Price Dawe*] is made 'under [a] contract' within the meaning of" Section 2704(b) (alteration in original)).

11

Wells Fargo under UCC Sections 8-115 and 8-502 are not available. This is because a Section 2704(a) action is not an "adverse claim" as that term is defined in UCC § 8-102.

Answering Question Two, we hold that a Section 2704(b) defendant may nevertheless recover the premiums it paid if it can prove its entitlement to them under a viable theory, such as unjust enrichment.

Our reasoning follows.

**A. Section 2704(b) Does Not Supersede All Defenses and Counterclaims Available to Downstream Purchasers.**

The threshold issue underlying the certified questions in this case is whether Section 2704(b) precludes a downstream purchaser of a policy that lacks an insurable interest from asserting any defense or counterclaim.[21] We conclude that it does not.

By providing that an estate "may maintain an action" to recover death benefits, Section 2704(b) confers standing on the estate[22] and codifies the

---

[21] *See* Berkshire's Opening Brief at 4, 43 (stating that the certified questions concern whether Section 2704(b) "overrides the defenses under the UCC and principles of equity that are available to innocent commercial actors in every other setting" and arguing that Section 2704(b) provides an estate with a right of action to recover the death benefit, "without purporting to abrogate any common-law equitable defenses that the defendant may have"); Estate's Answering Br. to Berkshire at 3, 17–18 (contending that "because Section 2704 enforces Delaware's constitutional prohibition on wagering, it must be applied to all STOLI investors, without exception," and arguing that Section 2704(b) "prevents the ultimate culmination of human life wagers by deputizing families" to recover any benefits paid under a STOLI policy "without exception," including any exception for downstream purchasers).

[22] *Cf. State ex rel. Lawrence v. Am. Ins. Co.*, 559 A.2d 1247, 1250 (Del. 1989) (stating that statute providing that a certain class of persons "may maintain an action" "confer[red] a cause of action" on those persons); *Quality Elec. Co. v. Eastern States Const. Serv., Inc.*, 1995 WL 379125, at *2 (Del. June 19, 1995) (citing *Lawrence* and stating that a person outside that class "lacks standing

longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit.[23] The provision describes the scope of the claim that the estate may assert as one for the recovery of "such benefits"—that is, "any benefits" received by "the beneficiary, assignee or other payee"—from the person who received them. Section 2704(b) does not expressly limit any defenses or counterclaims that the recipient might assert.

A statute does not repeal common law causes of action "unless the legislative intent to do so is plainly or clearly manifested."[24] "Although a statute that is inconsistent with common law, or that undertakes to revise and cover the entire subject matter, may implicitly repeal common law, repeal by implication is disfavored, and is deemed to occur only where there is fair repugnance between the common law and the statute, and both cannot be carried into effect."[25] When

---

to maintain an action" under the statute). *Cf. also 2004 Stuart Moldaw Trust v. XE L.I.F.E., LLC*, 374 Fed. Appx. 78, 81 (2d Cir. 2010) (describing the New York equivalent of Section 2704(b) as "concerning who has a right to bring an action to enforce the substantive prohibition against" policies lacking an insurable interest and contrasting New York law with California law, which lacks a comparable statute conferring a right of action on an estate and under which courts have held that the insurer is the only party that may raise the question of insurable interest).

[23] *See Warnock*, 104 U.S. at 782 (holding that administrator of the estate of the insured could recover death benefit paid to assignee that lacked insurable interest in the life of the insured). *Cf. In re Al Zuni Trading, Inc.*, 947 F.2d 1403, 1404 (9th Cir. 1991) (rejecting defendant's claim that insured's personal representative lacked standing to sue and noting that an Arizona statute similar to Section 2704(b) modified the general rule that "only the insurer can raise the objection of want of an insurable interest" (internal quotation and alteration omitted)).

[24] *A.W. Fin. Servs., S.A. v. Empire Resources, Inc.*, 981 A.2d 1114, 1122 (Del. 2009) (internal quotation omitted).

[25] *Id.*

13

determining whether a Delaware statute supersedes common law claims, this Court has applied the federal-preemption-analysis framework and examined whether (1) explicit language in the statute supersedes or limits the common law; (2) the statutory scheme evidences a legislative intent to occupy the field; and (3) the statutory scheme actually conflicts with common law.[26]

Applying that analysis here, the answer to all three inquiries is "no." First, Section 2704 does not contain any language that expressly supersedes or "repeal[s], wholesale, all common law claims."[27] Second, the statute does not "occupy the field so totally as to imply superseder."[28] For example, Section 2704 does not address what should happen with respect to premiums paid on void STOLI policies—whether the insurable-interest challenge is raised by an insurer, an estate, or some other party—and therefore requires courts to apply common-law principles when resolving disputes over premiums. Moreover, Section 2704 was enacted before "an active secondary market for life insurance" developed and before "securitization emerged in the life settlement industry."[29] Thus, insurers, insureds (or their estates),

---

[26] *Id.* at 1122–23.

[27] *Id.* at 1123. *See also id.* (contrasting the escheat statute, which the Court held did not reflect an intent to repeal common law claims, with other statutes that did "contain clear superseder language," such as providing for an "exclusive remedy").

[28] *Id.* at 1124 (capitalization modified). *Cf. also Estate of Berland*, 266 A.3d at 970 (observing that Section 2704 reflects an intent "to codify—not abrogate—the common law insurable interest requirement").

[29] *See Price Dawe*, 28 A.3d at 1069–70 (tracing historical developments in life-settlement industry).

and the third-party arrangers of illegal STOLI policies were likely the only parties that the General Assembly had in mind when enacting Section 2704. Given the developments in the industry since the enactment of Section 2704, that provision does not occupy the field as to potential claims by third-party purchasers of policies that lack an insurable interest.[30]

Finally, Section 2704(b) is not inconsistent with all common-law defenses or counterclaims that a downstream purchaser of a policy might assert against an estate. In the context of superseder analysis, this Court has explained why the statutory creation of immunity from liability does not supersede the common law of tort from which the liability arises.[31] Similarly, in the absence of express statutory language to the contrary, a statute conferring a cause of action on one party does not supersede common law defenses or counterclaims that the other party might assert. Rather, courts must look to the elements of the common-law defenses or counterclaims asserted—and, where appropriate, the public policy underlying the ban on human-

---

[30] *Cf. A.W. Fin. Servs.*, 981 A.2d at 1126 ("That history teaches that without any provision in the Escheat Statute authorizing a claim against the State Escheator, the owner would be barred from seeking compensation from the State under sovereign immunity. The General Assembly needed to—and did—create a statutory claims procedure against the State Escheator. The mere existence of such a procedure[,] however, cannot be fairly read to evidence a scheme so comprehensive that it must be read to impliedly supersede all common law causes of action against third parties.").
[31] *See id.* at 1126-27 (analogizing escheat-statute immunity to qualified immunity).

life wagering—to decide the viability of such defenses or counterclaims to an estate's action under Section 2704(b).[32] We do so next.

**B. Sections 8-502 and 8-115 of the Delaware UCC Do Not Provide Defenses in a Section 2704(b) Action.**

The first certified question inquires about the viability of two defenses to the Estate's Section 2704(b) claim that the defendants asserted in this case—a bona fide purchaser defense under UCC § 8-502 and a securities intermediary defense under UCC § 8-115. The Eleventh Circuit framed the question as follows:

> If an insurance contract is void under Del. Code Ann. tit. 18, § 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1073 (Del. 2011), is the party being sued under § 2704(b), as a third-party purchaser of the contract and holder of the proceeds, entitled to assert either a bona fide purchaser defense under Del. Code Ann. tit. 6, § 8-502, or a securities intermediary defense under Del. Code Ann. tit. 6, § 8-115?

As discussed, the Policy at issue in this case changed hands several times between its issuance and when Wells Fargo acquired it as securities intermediary in 2012. In 2013, Berkshire agreed to buy 125 life insurance policies, including the Policy, from Coventry, with Wells Fargo again serving as the securities intermediary. When Malkin died in 2014, AIG paid the death benefit—$4,013,976.47—to Wells Fargo, who transferred it to the securities account that it maintained for Berkshire.

---

[32] *Cf. id.* at 1127–28 (discussing availability of various common-law causes of action relating to property that was allegedly wrongfully escheated).

16

In the District Court, Berkshire and Wells Fargo asserted that they were bona fide purchasers for value under Section 8-502 of the Delaware UCC.[33] Wells Fargo also argued that, because its role was limited to that of a securities intermediary, UCC § 8-115 "immunizes" it from liability.[34] The District Court rejected these defenses as a matter of law, holding that Section 2704(b) effects the Delaware public policy against wagering on human life by ensuring that "such bets never pay off" and makes no exception for payees who are bona fide purchasers.[35] It wrote:

> Based on *Price Dawe*, it appears that Delaware's highest court would hold that [Section 2704(b)] means exactly what it says: as between the insured's loved ones and the strangers who sought to profit from her death, the former have the better claim to the insurance money, regardless of the latter's status under the UCC.[36]

The court rejected the securities intermediary defense on similar grounds. Even so, it added that:

> To the extent that Wells Fargo, after receiving the Policy proceeds, merely passed them on in full to Berkshire, Wells Fargo would appear to have no liability under [Section 2704(b)]. On the other hand, if Wells Fargo retained any of the proceeds for itself, then it is very much a 'payee under [a] contract made in violation' of the insurable interest statute.[37]

---

[33] 6 *Del. C.* § 8-502.

[34] *Id.* § 8-115.

[35] *Estate of Malkin v. Wells Fargo Bank, N.A.*, 379 F. Supp. 3d 1263, 1279 (S.D. Fla. 2019), *aff'd in part and questions certified*, 998 F.3d 1186 (11th Cir. 2021).

[36] *Id.*

[37] *Id.* (final alteration in the original) (citations omitted).

17

For the reasons discussed below, we hold that the District Court was correct: Section 2704(b) defendants cannot assert defenses under UCC §§ 8-502 or 8-115.

### i. Section 2704(b) Defendants Cannot Assert a UCC § 8-502 Defense.

Section 8-502 of the Delaware UCC provides:

> An action based on an adverse claim to a financial asset, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who acquires a security entitlement under Section 8-501 for value and without notice of the adverse claim.[38]

As an initial matter, a successful defense under UCC § 8-502 would require the facts to support the conclusion that the defendant acquired a security entitlement "for value" and "without notice" of the adverse claim. The certified question does not require this Court to weigh in on the application of the law to the facts of this case. Instead, it calls for analysis of whether, as a matter of law, a UCC bona fide purchaser defense may ever be asserted against a claim under Section 2704(b).

Berkshire and Wells Fargo treat this question as one of pure statutory interpretation. They argue that they satisfy each of the textual elements of a valid UCC § 8-502 defense and are therefore entitled to assert it because the provision contains no exceptions.[39] The Estate counters that "[n]o provision of Delaware law can be interpreted to allow investors to cash-in on a STOLI policy because doing so

---

[38] 6 *Del. C.* § 8-502.
[39] Berkshire's Opening Br. at 20–22.

18

would allow an illegal wager to pay off, which would violate Delaware's Constitution and public policy."[40] The Estate also argues that the textual elements of UCC § 8-502 are not met in this case because the Estate's Section 2704(b) action is not an "adverse claim" as UCC § 8-102(a)(1) defines that term.[41]

When interpreting a statute, our goal is "to ascertain and give effect to the intent of the legislators, as expressed in the statute."[42] If the plain statutory text admits only one reading, we apply it.[43] However, if the text supports multiple reasonable readings, the provision is ambiguous.[44] As we explained in *Price Dawe*, a statute is also ambiguous "if a literal reading of its terms 'would lead to an unreasonable or absurd result not contemplated by the legislature.'"[45] In such cases, we aim to "interpret statutory law consistently with pre-existing common law unless the legislature expresses a contrary intent,"[46] and we also seek "to read [the]

---

[40] Estate's Answering Br. to Berkshire at 16.

[41] *Id.* at 30.

[42] *Noranda Aluminum Holding Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 978 (Del. 2021) (citing *Dewey Beach Ent., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307 (Del. 2020)); *see also Spintz v. Div. of Fam. Servs.*, 228 A.3d 691, 698 (Del. 2020).

[43] *Dir. of Revenue v. Verisign*, 267 A.3d 371, 377 (Del. 2021) (citing *In re Port of Wilmington Gantry Crane Litig.*, 238 A.3d 921, 937 (Del. 2020)).

[44] *Verisign*, 267 A.3d at 377.

[45] *Price Dawe*, 28 A.3d at 1070 (quoting *LeVan v. Independence Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007), and *Newtowne Village Service Corp. v. Newtowne Raod Dev. Co., Inc.*, 772 A.2d 172, 175 (Del. 2001)).

[46] *Price Dawe*, 28 A.3d at 1070 (citing *A.W. Fin. Servs.*, 981 A.2d at 1121)).

statutory language so as to avoid constitutional questionability and patent absurdity and to give the language a reasonable and suitable meaning."[47]

In the *sui generis* context of STOLI, we conclude that an action to recover death benefits under Section 2704(b) does not assert an "adverse claim" as defined by UCC § 8-102(a)(1). We cannot find any basis in the text of the Delaware UCC to conclude that the General Assembly intended to violate the Delaware Constitution's general prohibition of wagering or alter the State's longstanding prohibition of STOLI policies. We therefore hold that Section 8-502 of the Delaware UCC does not offer a viable defense to an estate's Section 2704(b) claim against a downstream purchaser of a STOLI policy who later receives death benefits paid on that policy. Although the Appellants and *amici* advance a reading of UCC § 8-502 that might well be compelling in another context, their arguments suffer from two fatal flaws, each of which relates back to the unique character of STOLI policies and their historical treatment in Delaware.

*First*, the Appellants fail to account for the fact that STOLI policies are void *ab initio* on constitutional, statutory, and public policy grounds, and therefore never come into legal existence.[48] This is significant because the UCC § 8-502 defense

---

[47] *Sturgill v. M & M, Inc.,* 329 A.2d 360, 362 (Del. 1974); *see also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 287 n.42 (Del. 2016) (collecting cases).
[48] *See Price Dawe*, 28 A.3d at 1067. We stress that STOLI arrangements are unique in that they are not simply void *ab initio*, anathema to hundreds of years of public policy, or violative of the Delaware Constitution, but they boast all three of these unenviable qualities. This is why we have

requires the pressing of an "adverse claim," which UCC § 8-102(a)(1) defines as "a claim that a claimant has a *property interest* in a financial asset and that it is a *violation of the rights of the claimant* for another person to hold, transfer, or deal with the financial asset."[49] Nobody can have a "property interest" in a STOLI policy or its proceeds, however, because, as this Court held in *Price Dawe*, such policies are "nullities"—invalid human-life wagers that never come into legal existence.[50] Similarly, because STOLI policies are void *ab initio*, when an investor receives their proceeds it does not commit "a violation of the rights of the claimant" but rather a violation of Article II, Section 17 of Delaware Constitution and of the State's public policy. Thus, as a textual matter, we do not read the definition of "adverse claim" in Section 8-102(a)(1) of the UCC to include actions brought under Section 2704(b).[51]

*Second*, even if the Appellants were bona fide purchasers of the Policy, they never acquired the right to receive the death benefit. Berkshire—acting through

---

taken care to clarify that STOLI policies are *sui generis* and that our analysis in this case does not reach other securities that lack the same combination of attributes.

[49] 6 *Del. C.* § 8-102(a)(1) (emphasis added).

[50] *Price Dawe*, 28 A.3d at 1068 & n.25.

[51] *See* 7 HAWKLAND ET AL. UNIFORM COMMERCIAL CODE SERIES § 8-102:8 (2021) ("The concept of adverse claim is not, however, so broad as to reach all forms of assertions that a person acted wrongfully in transferring securities or other financial assets. The first question that must be asked is whether the person asserting the claim has a property interest. That issue is determined under law under than Article 8. A person may be acting in violation of another's rights in transferring securities, but unless the person whose rights are violated has a property interest, there is no adverse claim." (footnote omitted)).

Wells Fargo as securities intermediary—purchased the Policy in June 2013, 15 months before Malkin died and AIG paid the death benefit. Thus, when Berkshire made its purchase, it received a void *ab initio* policy that, under established law, did not exist and did not entitle the holder to receive any proceeds. As the comment to UCC § 8-502 explains:

> A security entitlement is a complex bundle of rights. This section does not deal with the question of what rights are in the bundle. Rather, this section provides that once a person has acquired the bundle, someone else cannot take it away on the basis of [an] assertion that the transaction in which the security entitlement was created involved a violation of the claimant's rights.[52]

Thus, in the context of a STOLI policy, the bundle of rights acquired by the securities entitlement holder includes a policy that was void from the outset and does not include the right to retain the death benefit if the insured's estate brings an action to recover the benefit under Section 2704(b). Put differently, the securitization of a STOLI policy and a later transfer of the security entitlement under the UCC does not bring the void policy back to life.[53]

---

[52] 6 *Del. C.* § 8-502 cmt. 1.

[53] *Cf. Sun Life Assurance Co. of Canada v. Conestoga Trust Servs., LLC*, 263 F. Supp. 3d 695, 703-04 (E.D. Tenn. 2017) (rejecting downstream purchaser's "innocent bona fide assignee" defense under Tennessee law because "a transferee's innocence or good faith will not revive a contract void from inception as an illegal wagering contract" and "[o]nce the policy has been tainted as a wagering contract, subsequent assignees take no greater rights in the policy than the initial wagerer, and the law will not permit that illegal and void contract to become valid and enforceable by virtue of a subsequent transfer"), *aff'd*, 717 Fed. Appx. 600 (mem.) (11th Cir. Apr. 3, 2018).

In answering the first part of Question One, we therefore hold that Section 2704(b) defendants may not assert a UCC § 8-502 defense because they are not faced with an "adverse claim" as the Delaware UCC defines that term.

### ii. Section 2704(b) Defendants Cannot Assert a UCC § 8-115 Defense.

Wells Fargo acted as a securities intermediary for Berkshire when Berkshire purchased the Policy in 2013. When Malkin died in 2014 and AIG paid the death benefit, Wells Fargo received it and deposited it into Berkshire's account. Wells Fargo now argues that, under Section 8-115 of the Delaware UCC, a securities intermediary that receives a death benefit paid on a STOLI policy and credits the funds to its customer's securities account cannot be held liable for the death benefit in an estate's action under Section 2704(b).[54]

Section 8-115 of the Delaware UCC provides that:

A securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or a broker or other agent or bailee that has dealt with a financial asset at the direction of its customer or principal, *is not liable to a person having an adverse claim* to the financial asset, unless the securities intermediary, or broker or other agent or bailee:

(1) took the action after it had been served with an injunction, restraining order, or other legal process enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the injunction, restraining order, or other legal process; or

---

[54] Wells Fargo's Opening Br. at 8–9.

(2) acted in collusion with the wrongdoer in violating the rights of the adverse claimant; or

(3) in the case of a security certificate that has been stolen, acted with notice of the adverse claim.[55]

We hold that, as with UCC § 8-502, UCC § 8-115 does not apply to an Estate's claim under Section 2704(b). This is because both provisions only operate against an "adverse claim." As discussed above, a Section 2704(b) action is not an "adverse claim" under the Delaware UCC.

That does not mean, however, that a securities intermediary will ultimately be liable to pay an estate under Section 2704(b). As the District Court observed, "[t]o the extent that Wells Fargo, after receiving the Policy proceeds, merely passed them on in full to Berkshire, Wells Fargo would appear to have no liability."[56] The comment to Section 8-115 explains that "[t]he policy of this section is similar to that of many other rules of law that protect agents and bailees from liability as innocent converters" and that "general tort law protects agents or bailees who act on the instructions of their principals or bailors."[57]

Hence, a securities intermediary who merely acts on the instructions of the beneficial owner of a STOLI policy and credits the policy proceeds to the beneficial owner's account is unlikely to face ultimate liability under Section 2704(b). Instead,

---

[55] 6 *Del. C.* § 8-115 (emphasis added).
[56] *Estate of Malkin*, 379 F. Supp. 3d at 1279.
[57] 6 *Del. D.* § 8-115 cmt. 2.

24

it will generally find protection from sources other than Section 8-115, such as general principles of agency law or its contract with its customer, the beneficial owner of the policy. Indeed, private ordering in this area is feasible: the certified record on appeal indicates that Wells Fargo contracted with Berkshire to secure broad exculpation and indemnification rights related to its conduct as securities intermediary.[58]

In answering the second part of Question One, we therefore hold that Section 2704(b) defendants may not assert a UCC § 8-115 defense because they are not faced with an "adverse claim" as the Delaware UCC defines that term.

## C. Section 2704(b) Defendants May Recover the Premiums they Paid if They Prove an Entitlement to Them Under a Viable Legal Theory.

The second certified question asks us to decide whether the defendant in an action under Section 2704(b) can recover any premiums it paid to maintain the policy. Berkshire asserted this claim in the form of a counterclaim for unjust enrichment, seeking a restitutionary offset from the Estate's recovery of the death benefit—if any—in the amount of the premiums that Berkshire paid after it acquired the Policy.[59] The Eleventh Circuit framed the question as follows:

---

[58] App. to Opening Br. at A186–87 (Berkshire agreeing that Wells Fargo "shall incur no liability whatsoever for any actions or omissions hereunder except for any such liability arising out of or in connection with [Wells Fargo's] gross negligence or willful misconduct" and also agreeing that Wells Fargo "shall be indemnified by [Berkshire] from and against any and all claims[.]").

[59] *See* App. to Opening Br at. A325 (alleging that after it purchased the policy, Berkshire maintained the policy until Malkin's death by paying $137,194.20 in premiums to the insurer; that without such payments, the policy would have lapsed before Malkin's death; and thus, if the estate

> If an insurance contract is void under Del. Code Ann. tit. 18, §
> 2704(a) and *PHL Variable Insurance Co. v. Price Dawe 2006
> Insurance Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059,
> 1073 (Del. 2011), can the party that is being sued under §
> 2704(b) recover premiums it paid on the void contract?"

Berkshire argues that if a defendant is ordered to pay a death benefit to an estate under Section 2704(b), the defendant should be permitted to receive a restitutionary offset in the amount of the premiums it paid while holding the policy because, in the absence of an offset, the estate will be unjustly enriched.[60] Berkshire also contends that it can satisfy the elements of unjust enrichment in the circumstances of this case.

The Estate argues that a downstream purchaser of a STOLI policy has a restitution claim only against the party with whom the purchaser was in contractual privity and not against the Estate.[61] The Estate asserts that Section 2704(b) bars a claim for a restitutionary offset because the statute "provides that an estate should recover 'any benefits' paid under a STOLI policy, not 'net benefits.'"[62] It further argues that Berkshire cannot satisfy the elements of an unjust enrichment claim because Berkshire did not act "for" the estate's benefit, it has an adequate remedy at

---

is entitled to the policy proceeds, Berkshire will have conferred a benefit on the estate by paying the premiums).

[60] The amici argue in support of an even broader holding that would allow the recipient of the death benefit to offset all premiums paid, even those by paid by prior holders of the policy. The Eleventh Circuit did not certify this question and Berkshire has not asserted such a broad claim, so the Court need not reach this issue.

[61] The District Court dismissed the counterclaim on this basis. *Estate of Malkin v. Wells Fargo Bank, N.A.*, Case No. 170CV-23136-MGC, Docket No. 208, at 20:8-18 (S.D. Fla.) (transcript of May 8, 2019 hearing on motion to dismiss).

[62] Estate's Answering Br. to Berkshire at 39.

law, and it would not be able to prove that it was reasonably unaware of the insurable-interest problem with the policy.

Several courts have addressed whether a policyholder may recover the premiums it paid when the *insurer* raises an insurable-interest challenge to a life insurance policy.[63] But few, if any, decisions have addressed whether a downstream purchaser of a policy may recover, in a case brought by an estate under Section 2704(b), premiums it paid to maintain the policy. That said, and as discussed above, Section 2704(b) does not foreclose the assertion of common-law counterclaims. A

---

[63] *See, e.g.*, *Sun Life Assurance Co. of Canada v. Wilmington Trust, N.A.*, 2022 WL 179008, at *12–14 (Del. Super. Ct. Jan. 12, 2022) (holding, in action where insurer brought insurable-interest challenge, that premiums paid on a policy that lacked insurable interest "must be reimbursed to the party that paid them" and stating that "it would not be fair for [the insurer] to retain all premiums, while never having to pay death benefits as agreed in exchange for receiving premiums" but that it "also appears unfair for investors to be reimbursed for premiums if they knew that they were inducing STOLI policies"); *Brighthouse Life Ins. Co. v. Geronta Funding*, 2021 WL 4080672, at *19 (Del. Super. Ct. Aug. 20, 2021) (appeal pending) (addressing claim by policyholder, a "sophisticated company with knowledge and experience in the life insurance investor market," for restitution of premiums from insurer where policy lacked insurable interest because the insured was fictitious); *Columbus Life Ins. Co. v. Wilmington Trust, N.A.*, 2021 WL 1820573, at *8–9 (D. Del. May 6, 2021) (recommending denial of insurer's motion to dismiss policyholder's counterclaim for restitution of premiums paid on policy where insurer challenged insurable interest, and stating that the "Delaware Supreme Court has yet to tell us whether and under what circumstances restitution can be recovered from an insurer when a policy is found to be an illegal STOLI policy," but that "federal courts applying Delaware law have consistently permitted requests for the return of premium payments, even if they weren't expressly styled as claims for restitution"), *adopted by* 2021 WL 3886370 (D. Del. Aug. 31, 2021); *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 2020 WL 1503641, at *15 (N.D. Ill. Mar. 30, 2020) (applying Illinois law and holding that insurance policy was void ab initio because it lacked an insurable interest and denying insurer's motion for summary judgment on claim for restitution of premiums paid on behalf of entity that beneficially owned policy at time of insured's death); *Lincoln Nat'l. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 564-65 (D. Del. 2010) (dismissing insurer's claim seeking to retain premiums in action where it sought to rescind policy for lack of insurable interest, stating that "[i]n an equitable action such as this, plaintiff may not have it both ways").

claim for unjust enrichment, moreover, does not on its face violate the Delaware Constitution's general prohibition of wagering or the State's longstanding policy of preventing STOLI policies from paying out to investors. In answering Question Two, we therefore hold that the party that is being sued under Section 2704(b) may recover the premiums it paid on the void contract if it can prove its entitlement to those premiums under a viable legal theory.

In the context of this case, Berkshire asserted a counterclaim for unjust enrichment, seeking to recover the premiums it paid as a restitutionary offset to the Estate's recovery under Section 2704(b). "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[64] The elements of an equitable claim of unjust enrichment are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[65] Berkshire contends that if the Estate receives the death benefit without an offset, the Estate will have been enriched by Berkshire's payment of $137,194.20 in premiums, without which the Policy would have lapsed and the Estate would have received nothing, and that Berkshire has no other remedy at law.

---

[64] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (internal quotations omitted).
[65] *Id.*

As an initial matter, the Estate argues that Berkshire must look to the party with which it was in contractual privity—that is, the party from which Berkshire acquired the Policy—in order to recover its expenses. Before considering a claim for unjust enrichment, "courts will engage in the threshold inquiry of determining whether a contract already governs the parties' relationship; if it does, the contract provides the measure of the plaintiff's right."[66] But where, as here, there is no contract between the parties to an unjust enrichment claim, that threshold inquiry does not preclude recovery.[67] Whether or not this claim will ultimately be a winner for Berkshire depends on determinations still to be made by the factfinder. Below, we briefly address some of the legal issues presented by the certified question.

The Estate maintains that Berkshire cannot demonstrate a "direct relationship" between the Estate's enrichment and Berkshire's impoverishment because Berkshire did not act "for" the estate's benefit.[68] This argument has its origins in case law discussing whether a benefit was "officiously conferred."[69] Delaware has adopted the provision in Section 112 of the *Restatement of Restitution* providing that "'where a person has officiously conferred a benefit upon another, the other is enriched but is not considered to be unjustly enriched'; thus, '[a] person who officiously confers

---

[66] *Metcap Secs. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899, 2009 WL 2470336 (Del. Aug. 13, 2009) (TABLE).
[67] *Id.*
[68] Estate's Answering Br. to Berkshire at 39 (emphasis removed).
[69] *Metcap*, 2009 WL 513756, at *9–10.

a benefit upon another is not entitled to restitution.'"[70]  An officiously conferred benefit is one that is conferred "without mistake, coercion or request."[71]  In other words, "it is a prerequisite to an unjust enrichment claim" that the plaintiff acted for the defendant's benefit.[72]  Thus, if a downstream purchaser is found to have paid the premiums officiously, it would not be entitled, under an unjust enrichment theory, to an offset from the estate that ultimately benefited from those payments.  We make no finding on this question and reserve the issue for determination by the certifying jurisdiction.

Next, the parties appear to agree that Berkshire cannot recover the premiums it paid if Berkshire was not reasonably unaware of the insurable-interest problem.[73]  We leave for determination by the certifying jurisdiction the issue whether Berkshire was reasonably unaware that the Policy was a STOLI arrangement and, thus, whether an award of restitution would be consistent with "the fundamental principles of justice or equity and good conscience."[74]

---

[70] *Id.* at *9 (quoting RESTATEMENT (FIRST) OF RESTITUTION § 112 (1937) (alteration in original).

[71] RESTATEMENT (FIRST) OF RESTITUTION § 112 (1937), *quoted in Metcap*, 2009 WL 513756, at *9.  *See also Creditors' Committee of Essex Builders, Inc. v. Farmers Bank*, 251 A.2d 546, 549 (Del. 1969) ("Receipt of a benefit as the incidental result of someone else's activities is not enough to require restitution.  There is no evidence here of any mistake, coercion, or request which might change the result." (citations to *Restatement* omitted)).

[72] *Metcap*, 2009 WL 513756, at *10.

[73] Berkshire's Opening Br. at 41; Estate's Answering Br. to Berkshire at 40.

[74] *Nemec*, 991 A.2d at 1130.

Finally, the Estate argues that Berkshire has an adequate remedy at law—namely, a claim against Coventry for selling it a STOLI policy in violation of Coventry's contractual promise that the policy was not a STOLI arrangement. If the factfinder determines that this is the case, then Berkshire will not be able to demonstrate its entitlement to a restitutionary offset against the Estate.[75]

Answering Question Two, we therefore hold that Section 2704(b) defendants may recover the premiums they paid on a policy later determined to be STOLI if they can establish the elements of a viable legal theory, such as unjust enrichment.

## IV.   CONCLUSION

The Clerk of the Court is directed to transmit this Opinion to the United States Court of Appeal for the Eleventh Circuit.

---

[75] *See id.* (including "the absence of a remedy provided by law" among the elements of unjust enrichment).